UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

BROWNMARK FILMS, LLC,

        PLAINTIFF,

    V.                             CASE NO. 2:10-CV-01013-JPS

COMEDY PARTNERS, MTV
NETWORKS, PARAMOUNT HOME
ENTERTAINMENT INC., SOUTH
PARK DIGITAL STUDIOS LLC, AND
VIACOM INTERNATIONAL, INC.,

        DEFENDANTS.

---

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT

---

James D. Peterson
Wisconsin State Bar No. 1022819

GODFREY & KAHN, SC
One East Main Street
P.O. Box 2719
Madison, WI 53701-2719
Telephone: (608) 257-3911
Facsimile: (608) 257-0609
Email: jpeterson@gklaw.com

Alonzo Wickers IV (*Of Counsel*)
California State Bar No. 169454
Jeff Glasser (*Of Counsel*)
California State Bar No. 252596

DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., Suite 2400
Los Angeles, California 90017-2566
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

*Attorneys for Defendants,*
*Comedy Partners, MTV Networks,*
*Paramount Home Entertainment,*
*South Park Digital Studios LLC, and*
*Viacom International, Inc.*

# TABLE OF CONTENTS

Page

1.  SUMMARY OF ARGUMENT ........................................................................1

2.  SUMMARY OF PLAINTIFF'S ALLEGATIONS AND *SOUTH PARK*'S PARODY. ................................................................................................4

3.  A MOTION TO DISMISS IS PROPER WHERE, AS HERE, THE PLAINTIFF CANNOT STATE A CLAIM FOR RELIEF. ..................................................6

4.  BROWNMARK LACKS STANDING TO PROSECUTE THIS ACTION. .....................9

5.  THE FAIR-USE DEFENSE DEFEATS BROWNMARK'S CLAIMS. ...........................10

    A.  The Purpose And Character Of The South Park Defendants' Use ........................12

    B.  The Nature Of WWITB ..............................................................17

    C.  The Substantiality Of *South Park*'s Use ..........................................17

    D.  The Effect On The Market For WWITB ..............................................20

6.  CONCLUSION..............................................................................21

DWT 16591148V4 3970094-000069

# TABLE OF AUTHORITIES

Page

CASES

*Albany Bank & Trust Co. v. Exxon Mobil Corp.*,
    310 F.3d 969 (7th Cir. 2002) ................................................................7

*Arica Institute Inc. v. Palmer*,
    970 F.2d 1067 (2d Cir. 1992)..................................................12, 17

*Ashcroft v. Iqbal*,
    556 U.S. ---, 129 S. Ct. 1937 (2009)......................................7

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................6, 7

*Bourne Co. v. Twentieth Century Fox*,
    602 F. Supp. 2d 499 (S.D.N.Y. 2009)..................................3, 14

*Burnett v. Twentieth Century Fox*,
    491 F. Supp. 2d 962 (C.D. Cal. 2007) ....................................3, 7, 8, 14

*Campbell v. Acuff-Rose Music*,
    510 U.S. 569 (1994)................................................................ passim

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
    95 F.3d 959 (10th Cir. 1996) ................................................10

*Chicago Bd. of Education v. Substance, Inc.*,
    354 F.3d 624 (7th Cir. 2003) ................................................18

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*,
    886 F.2d 490 (2d Cir. 1989)..................................................10

*Cooney v. Rossiter*,
    583 F.3d 967 (7th Cir. 2009) ................................................7

*Elsmere Music v. Nat'l Broadcasting Co.*,
    482 F. Supp. 741 (S.D.N.Y. 1980), *aff'd* 623 F.2d 252 (2d Cir. 1980)......................16, 18, 20

*Elsmere Music v. Nat'l Broadcasting Co.*,
    623 F.2d 252 (2d Cir. 1980)..................................................2, 3

*Eveready Battery Co. v. Adolph Coors Co.*,
    765 F. Supp 440 (N.D. Ill. 1991) ..........................................3, 8, 18

Case 2:10-cv-01013-JPS   Filed 02/22/11   Page 3 of 28   Document 9

*Fisher v. Dees*,
794 F.2d 432 (9th Cir. 1986) ............................................................................8, 20

*In re Harley Davidson, Inc. Secs. Litig.*,
660 F. Supp. 2d 969 (E.D. Wisc. 2009) .....................................................................7

*Kane v. Comedy Partners*,
68 U.S.P.Q.2d 1748 (S.D.N.Y. 2003) ........................................................................3

*Karll v. Curtis Publ'g Co.*,
39 F. Supp. 836 (E.D. Wis. 1941) ...........................................................................18

*Leadsinger, Inc. v. BMG Music Publ'g*,
512 F.3d 522 (9th Cir. 2008) ....................................................................................8

*Leibovitz v. Paramount Pictures Corp.*,
948 F. Supp. 1214 (S.D.N.Y. 1996), *aff'd* 137 F.3d 109 (2d Cir. 1998) ....................... passim

*Lewis Galoob Toys v. Nintendo of America*,
780 F. Supp. 1283 (N.D. Cal. 1991), *aff'd*, 964 F.2d 965 (9th Cir. 1992) .............................17

*Lewis Galoob Toys, v. Nintendo of America*,
964 F.2d 965 (9th Cir. 1992) ..................................................................................10

*Los Angeles News Service v. KCAL-TV Channel 9*,
108 F.3d 1119 (9th Cir. 1997) ................................................................................17

*Lucasfilm v. MediaMarket Group*,
182 F. Supp. 2d 897 (N.D. Cal. 2002) .....................................................................16

*Mattel v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) ................................................................10, 13, 16, 20

*Maxtone-Graham v. Burtchaell*,
803 F.2d 1253 (2d Cir. 1986) ............................................................................12, 20

*Mid-America Regional Bargaining Ass'n v. Will County Carpenters Dist. Council*,
675 F.2d 881 (7th Cir. 1982) .....................................................................................7

*Norse v. Henry Holt and Co.*,
847 F. Supp. 142 (N.D. Cal. 1994) .........................................................................11

*Nuñez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000) .....................................................................................17

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992) ...................................................................................18

Case 2:10-cv-01013-JPS   Filed 02/22/11   Page 4 of 28   Document 9

*Savage v. Council on American-Islamic Relations*,
   87 U.S.P.Q.2d 1730 (N.D. Cal. 2008) .................................................7, 8

*Sedgwick Claims Management Servs. v. Delsman*,
   2009 WL 2157573 (N.D. Cal. July 17, 2009)...........................................8

*Sony Corp. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ....................................................................11

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) .................................................2, 9, 10

*Tellabs, Inc. v. Makor Issues & Rights*,
   551 U.S. 308 (2007).....................................................................5, 7

*Ty, Inc. v. Publications Int'l Ltd.*,
   292 F.3d 512 (7th Cir. 2002) .........................................................13

*World Wrestling Federation Entertainment v. Big Dog Holdings*,
   280 F. Supp. 2d 413 (W.D. Pa. 2003) ..............................................13

*Wright v. Warner Books*,
   953 F. 2d 731 (2d Cir. 1991).........................................................11

STATUTES

17 U.S.C. § 107.................................................................2, 10, 11, 12

17 U.S.C. § 107(1)..............................................................................12

17 U.S.C. § 107(1)-(4)........................................................................11

17 U.S.C. § 107(2)..............................................................................16

RULES

Federal Rule of Civil Procedure 12(b)(6) ......................................6, 8

Federal Rule of Civil Procedure 12(c) ...........................................7, 8

Federal Rule of Civil Procedure 56 ...................................................9

CONSTITUTIONAL PROVISIONS

First Amendment ..........................................................................10, 14

iv

**OTHER AUTHORITIES**

Notes on Committee on the Judiciary, H.R. Rep. No. 1476, 94th Cong., 2d Sess.,
 *reprinted in* 1976 U.S. Code Cong. & Admin. News 5659 ....................................................13

"Who's Winning? A Nutshell Update On The Writer's Strike," published in Slate under
 the byline of Kim Masters and available at http://www.slate.com/id/2176909/.......................5

Defendants Comedy Partners, MTV Networks, Paramount Home Entertainment Inc., South Park Digital Studios LLC, and Viacom International (collectively "the South Park Defendants") respectfully submit the following memorandum of law in support of their motion to dismiss plaintiff Brownmark Films, LLC's Amended Complaint.

## 1. SUMMARY OF ARGUMENT

Brownmark Films claims to own the copyright to the music video "What What (In The Butt)," a video that has been viewed more than 37 million times on the Internet, and is thus referred to as a "viral" video.[1] The video's extraordinary, if inexplicable, popularity on the web and its overtly sexual imagery have made it a ripe target for parody. In 2008, Comedy Central's long-running animated series *South Park* parodied the "What What (In The Butt)" ("WWITB") video as part of an episode that commented on the phenomenon of inane viral videos. More than two years later, Brownmark filed this copyright-infringement lawsuit, alleging that the South Park Defendants infringed the copyright in the WWITB video.[2]

Brownmark's lawsuit must be dismissed on two independent grounds. First, Brownmark does not have standing to sue. Its amended complaint and the attached copyright-registration certificate establish that Andrew Swant, Bobby Ciraldo, and Sam Norman jointly registered the copyright in the WWITB video and were co-owners of the copyright, and that *only Swant and Ciraldo* assigned their interests to Brownmark. Amended Compl. ¶¶ 12-13 and Ex. A. Brownmark does not, and cannot, allege that Norman assigned his rights in the work. *Id.* Because all of the co-owners did not assign their rights, Brownmark obtained nothing more than

---

[1] *See* Req. for Jud. Not. and Declaration of Jeff Glasser, Exs. 1-3. A "viral video" is one that becomes popular through the process of Internet sharing, typically through video-sharing websites such as YouTube or through email.

[2] This *only* alleged infringement concerns the music video for WWITB, not the song itself. Amended Compl. ¶¶ 11, 15.

1

a non-exclusive license to use the WWITB video. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1145-1146 (9th Cir. 2008). The law is clear that a non-exclusive licensee does not have standing to sue for copyright infringement. *Id.* On that basis alone, Brownmark's claims fail as a matter of law.

The second ground for dismissing this suit is that Brownmark's infringement claims are barred by the fair-use defense. The fair use doctrine has been recognized in U.S. courts for more than a century. Indeed, more than thirty years ago, the Second Circuit explained that "in today's world of often unrelieved solemnity, copyright law should be hospitable to the humor of parody." *Elsmere Music v. Nat'l Broadcasting Co.*, 623 F.2d 252, 253 (2d Cir. 1980). The fair-use defense, which is codified at 17 U.S.C. § 107, ensures the breathing space necessary for criticism and commentary, and prevents copyright owners from misusing copyright law to silence criticism or punish parodists. Indeed, the United States Supreme Court has emphasized that "parody has an obvious claim to transformative value, … can provide social benefit," and thus "may claim fair use under § 107." *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 579 (1994). In *Campbell*, which involved the rap group 2 Live Crew's parody of the classic Roy Orbison song "Pretty Woman," the Court defined parody as a "literary or artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule." *Id.* at 580. "For the purposes of copyright law, the nub of the definitions, and the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Id.*

Section 107 sets forth four fair-use factors for a court to consider: (1) the purpose of the defendant's use; (2) the nature of the plaintiff's work, including whether it had been published at the time of the alleged infringement; (3) the amount or substantiality of the defendant's use; and

(4) the economic effect of the defendant's use on the market for the plaintiff's work. In this case, the fair-use factors weigh heavily in favor of the South Park Defendants. *First*, the show used elements of the WWITB video for purposes of parody, to poke fun at the imagery and meaning of WWITB as part of its commentary on the phenomenon of viral videos. *Second*, WWITB had been viewed millions of times before the *South Park* parody aired; indeed, its ubiquity on the Internet was one of the primary reasons that the South Park Defendants chose to parody WWITB. *Third*, a parodist is entitled to use recognizable elements of the plaintiff's work, as the South Park Defendants did here, so that the audience may recognize the target of the humor. *Fourth*, the economic impact of the defendant's use has little relevance in parody cases. As the Supreme Court emphasized in *Campbell*, "there is no protectable derivative market for criticism." 510 U.S. at 592. "[T]he unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market." *Id.*

Analyzing these four factors, courts consistently have held that the fair-use defense defeats copyright-infringement claims that target parodies. For example, courts have dismissed claims that targeted a *Saturday Night Live* parody of the "I Love NY" ad jingle (*Elsmere Music*, 623 F.2d at 254); a *Daily Show with Jon Stewart* parody of a risqué program on public-access cable television (*Kane v. Comedy Partners*, 68 U.S.P.Q.2d 1748, 1752 (S.D.N.Y. 2003)); a *Family Guy* parody of Carol Burnett's iconic Charwoman character (*Burnett v. Twentieth Century Fox*, 491 F. Supp. 2d 962, 972 (C.D. Cal. 2007)); and a *Family Guy* parody of the classic Disney song "When I Wish Upon A Star" (*Bourne Co. v. Twentieth Century Fox*, 602 F. Supp. 2d 499, 506-509 (S.D.N.Y. 2009)). Courts even have held that the fair-use defense protected a beer ad that parodied the Energizer Bunny ad campaign (*Eveready Battery Co. v.*

*Adolph Coors Co.*, 765 F. Supp 440, 446 (N.D. Ill. 1991)); and an ad for the movie *The Naked*

*Gun 33 1/3* that parodied photographer Annie Leibowitz's celebrated portrait of a pregnant Demi

Moore (*Leibovitz v. Paramount Pictures Corp.*, 948 F. Supp. 1214, 1226 (S.D.N.Y. 1996), *aff'd*

137 F.3d 109 (2d Cir. 1998)).  This Court should reach the same result here, and should find as a

matter of law that *South Park*'s parody of WWITB is a fair use.

    For each of these reasons, the South Park Defendants respectfully request that the Court

grant their motion and dismiss Brownmark's copyright infringement claims without leave to

amend.

## 2.  SUMMARY OF PLAINTIFF'S ALLEGATIONS AND *SOUTH PARK*'S PARODY.

    As it enters its fifteenth season on Comedy Central, the television series *South Park* is

well known for its cutout-style animation, pop-culture parody, scatological humor, and satirical

commentary on current events.  Through the years, the program has poked fun at such figures as

Tom Cruise, Paris Hilton, Al Gore, and Saddam Hussein, and has parodied such works as *The*

*Passion of The Christ*, *The Wizard of Oz,* and *The Island of Dr. Moreau*.[3]

    This lawsuit arises from a 2008 episode of *South Park* entitled "Canada on Strike," which

shone a humorous light on the 2007-2008 strike by television and film writers in the Writer's

Guild of America.[4]  One of the union's demands was a greater share of the revenues that

---

[3] Comedy Partners owns the copyright to all *South Park* episodes.  MTV Networks owns Central
Productions LLC, which produces and distributes *South Park*.  South Park Digital Studios is a
joint venture between Central Productions LLC and the co-creators of South Park, Matt Stone
and Trey Parker; it controls certain aspects of *South Park*'s digital distribution.  Defendant
Paramount Home Entertainment distributes *South Park* DVDs.  *South Park* airs on the Comedy
Central cable-television network, which is a division of MTV Networks.  MTV Networks is a
division of Viacom Inc.

[4] *See* Req. for Jud. Not. and Declaration of Jeff Glasser, Ex. 2.  As discussed below in Section 3,
the Court may consider the WWITB music video and the allegedly infringing episode of *South
Park* in connection with this motion, without converting it to a motion for summary judgment,
because the video and the episode are referred to in, and are essential to, Brownmark's complaint

entertainment studios generate on the Internet.[5]  In the episode in question, the entire nation of Canada goes on strike, demanding that the world give Canadians a greater share of the revenues that they imagine are being generated by viral videos and other forms of Internet content. Amended Compl. ¶ 14; Req. for Jud. Not. and Declaration of Jeff Glasser, Ex. 2.  To try to meet the striking Canadians' demands, the five South Park Elementary schoolboys who are the focus of the show – Eric Cartman, Stan Marsh, Kyle Broflovski, Kenny McCormick, and Butters Stotch – decide to make a viral video, which turns out to be an animated parody of the "What What (In The Butt)" video.  Req. for Jud. Not. and Declaration of Jeff Glasser, Ex. 2.  The original WWITB video features an African-American male singer wearing tight pants who vamps through choruses of "I said, what what, in the butt" and "you want to do it in my butt, in my butt?" and lyrics such as "I will give you what you need; all I want is your big fat seed; give it to me, if you please," while highly sexualized imagery appears in the background.  *Id.*, Ex. 1. In *South Park*'s parody, the song's crudely sexual lyrics are delivered by Butters Stotch, a blonde fourth grade animated character who is the most naïve and sweetly innocent of the show's schoolboys, and is dressed at times in the video as a teddy bear, an astronaut, and a daisy.  Ex. 2. Like WWITB, the boys' video becomes an Internet phenomenon; in fact, for part of 58 seconds that the boys' video appears on screen, it is visible only on the computer monitors of Internet users in South Park, Colorado and across the world.  *Id.*

Giddy with the "success" of their video, the boys go to a bank to find out how much money their Internet celebrity has earned them.  *Id.*  In the bank lobby, they meet animated versions of the real-life stars of several other highly viral videos that have captured the public's

---

for copyright infringement.  *See, e.g., Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 323 (2007); *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).

[5] *See, e.g.,* "Who's Winning? A Nutshell Update On The Writer's Strike," published in Slate under the byline of Kim Masters and available at http://www.slate.com/id/2176909/.

5

attention on the Internet, including Tay Zonday of "Chocolate Rain," the Numa Numa Guy, the Tron Guy, the Star Wars Kid, the Dramatic Gopher, the Laughing Baby, the Sneezing Panda, and Afro Ninja. *Id.* Like Sam Norman (a/k/a Samwell) and the "What What (In The Butt)" video, all of these figures and their respective viral videos have been viewed millions of times on the Internet and are recognizable to regular web users and YouTube fans. In the waiting room, each viral-video star reenacts elements from his signature video – the Numa Numa Guy lip-synchs, the Afro Ninja trips over himself, the Sneezing Panda sneezes, and, of course, the Dramatic Gopher looks very dramatic. *Id.* By the end of the program, the Canadians have ended their strike (just as the television and film writers did), the boys have learned that viral videos generate very little revenue, and Kyle has given a speech about the difficulty of monetizing Internet celebrity. *Id.* In sum, the episode pokes fun at Internet users' apparently insatiable appetites for inane viral videos and pointedly parodies one of the most widely-viewed viral videos of all time, "What What (In The Butt)." *Id.*

Despite the episode's obvious parody, Brownmark filed this lawsuit on November 12, 2010. Its amended complaint alleges five copyright-infringement claims against the South Park Defendants, all arising from the creation and dissemination of the episode in question on television, on the Internet, and on DVD. The South Park Defendants now move to dismiss the amended complaint in its entirety.

## 3. A MOTION TO DISMISS IS PROPER WHERE, AS HERE, THE PLAINTIFF CANNOT STATE A CLAIM FOR RELIEF.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. Dismissal is warranted if no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007). In evaluating the facts alleged in the complaint, a court should not "accept legal

conclusions that may be alleged or that may be drawn from the pleaded facts," and "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Mid-America Regional Bargaining Ass'n v. Will County Carpenters Dist. Council*, 675 F.2d 881, 883 (7th Cir. 1982) (citations and internal quotation marks omitted). Indeed, a plaintiff is required to provide factual grounds for its claims beyond mere labels and conclusions. *Twombly*, 550 U.S. at 555, 563; *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1950 (2009). As the Seventh Circuit stated in *Cooney v. Rossiter*, 583 F.3d 967 (7th Cir. 2009), "'determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 971 (quoting *Iqbal*, 129 S. Ct. at 1950).

When ruling on a motion to dismiss, a court is not limited to the allegations set forth in the plaintiff's complaint. Instead, courts also may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 323. In particular, the Seventh Circuit "has permitted district courts to examine documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to her claim." *Albany Bank & Trust*, 310 F.3d at 971. *See also In re Harley Davidson, Inc. Secs. Litig.*, 660 F. Supp. 2d 969, 973 (E.D. Wis. 2009) (same; "[i]n addition to the complaint, the court [in considering a motion to dismiss] may consider documents incorporated therein by reference and those matters of which a court may take judicial notice"). This doctrine permits the Court to examine both the WWITB music video and the allegedly infringing episode of *South Park* as it decides this motion.[6]

---

[6] *See, e.g., Burnett*, 491 F. Supp. 2d at 966 (reviewing allegedly infringing episode of defendant's television program *Family Guy* in deciding motion to dismiss on fair-use grounds, even though episode was not attached to complaint); *Savage v. Council on American-Islamic*

By applying the incorporation-by-reference doctrine, a court may grant a motion to dismiss on fair-use grounds. In *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008), the court explained that a defendant's "assertion of fair use may be considered on a motion to dismiss, which requires the court to consider all allegations to be true, in a manner substantially similar to consideration of the same issue on a motion for summary judgment, when no material facts are in dispute." In *Burnett*, for example, the court granted a 12(b)(6) motion to dismiss comedienne Carol Burnett's copyright-infringement claim stemming from a "crude" parody of her Charwoman character on the animated television series *Family Guy*. 491 F. Supp. 2d at 971-972. After reviewing the episode in question, the court determined as a matter of law that the defendant's use of Burnett's work was a fair use and dismissed her copyright-infringement claim. *Id.* at 972. Similarly, in *Savage*, the court held that a civil-liberties organization's use of a four-minute segment from the plaintiff's syndicated national radio talk show was a fair use, and granted the defendant's Rule 12(c) motion. 87 U.S.P.Q.2d at 1734-1735. *See also Sedgwick Claims Management Servs. v. Delsman*, 2009 WL 2157573, at *11-*12 (N.D. Cal. July 17, 2009) (finding as matter of law that defendant's use of two photographs of "WANTED" posters on blog as part of a critical commentary was protected fair use; granting motion to dismiss copyright-infringement claim).[7]

---

*Relations*, 87 U.S.P.Q.2d 1730, 1732 (N.D. Cal. 2008) (reviewing defendant's allegedly infringing article from website in deciding Rule 12(c) motion on fair-use grounds, even though article was not attached to complaint).

[7] In other parody cases, courts have found fair use as a matter of law on summary judgment. *See, e.g.,Fisher v. Dees*, 794 F.2d 432, 440 (9th Cir. 1986) (defendant's humorous song "When Sonny Sniffs Glue," which mocked the 1950s hit "When Sunny Gets Blue," was protected fair use); *Leibovitz*, 948 F. Supp. at 1226, *aff'd* 137 F.3d 109 (2d Cir. 1998) (defendant's movie poster parodying famous portrait of pregnant Demi Moore was protected fair use). *See also Eveready*, 765 F. Supp. at 447 (denying plaintiff's motion for preliminary injunction in copyright-infringement case; finding as a matter of law that Eveready could not show a probability of prevailing on copyright claim because Coors' ad parodying Energizer Bunny was

As these cases illustrate, this Court can and should address fair use in connection with this motion to dismiss.[8]

## 4. BROWNMARK LACKS STANDING TO PROSECUTE THIS ACTION.

This Court may dismiss Brownmark's claims without even addressing the WWITB video or the *South Park* episode at issue because the amended complaint confirms that Brownmark does not have standing to prosecute this action. In *Sybersound Records*, the Ninth Circuit recognized that a co-owner of a copyright cannot grant exclusive rights in copyright without the consent of *all* other co-owners. 517 F.3d at 1145-1146. There, TVT, the "original co-claimant or joint copyright holder (co-owner) in nine songs," purportedly had assigned to the plaintiff an exclusive right in the songs. *Id.* at 1145. But none of the other co-owners of the copyrights in those songs had assigned their interests to the plaintiff. *Id.* When the plaintiff subsequently sued a third party for infringing the copyrights in the songs, the district court dismissed the claim. *Id.* at 1145-1146. The Ninth Circuit affirmed, making clear that "unless *all* the other co-owners of the copyright joined in granting an exclusive right to [the plaintiff], TVT, acting solely as a co-owner of the copyright, could grant *only a nonexclusive license* to [the plaintiff] because TVT may not limit the other co-owners' independent rights to exploit the copyright." *Id.* at 1146 (emphases added). Because a nonexclusive licensee does not have standing to sue for copyright infringement, the Ninth Circuit held that the plaintiff's claim was defective as a matter of law. *Id.*

_____

protected fair use).

[8] Alternatively, because there are no disputed issues of material fact and both the WWITB music video and the *South Park* parody are properly in the record, the Court may convert this motion to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and resolve these issues in favor of the South Park Defendants.

The present case is indistinguishable from *Sybersound Records*. Like TVT, Ciraldo and Swant each is an "original co-claimant or joint copyright holder" in the WWITB music video. Amended Compl. ¶¶ 11-12 and Ex. A. Sam Norman also is an original co-claimant or joint owner of the copyright. *Id.* According to the amended complaint, Ciraldo and Swant – *but not Norman* – assigned their rights to Brownmark in 2008. *Id.* ¶ 13. Under *Sybersound Records*, Ciraldo and Swant could grant Brownmark only a nonexclusive license in WWITB. 517 F.3d at 1145-1146. Without Norman, they could not grant exclusive rights to Brownmark, because doing so would have impermissibly limited Norman's rights. *Id.* As a mere nonexclusive licensee, Brownmark lacks standing to prosecute its copyright-infringement claims against the South Park Defendants. For that reason alone, the amended complaint must be dismissed.

**5. THE FAIR-USE DEFENSE DEFEATS BROWNMARK'S CLAIMS.**

The South Park Defendants' use of several visual elements of WWITB in its parody is a quintessential fair use. The Supreme Court has explained that a parody is an "artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule." *Campbell*, 510 U.S. at 580. "[P]arody is a form of social and literary criticism" that "has socially significant value as free speech under the First Amendment." *Mattel v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003). Because parody implicates "core" constitutional concerns, *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996), courts uniformly have noted "the broad scope permitted parody in First Amendment law." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group*, 886 F.2d 490, 493 (2d Cir. 1989).

These principles are reflected in Section 107 of the Copyright Act, which codifies the fair-use doctrine and creates a "privilege to use copyrighted material in a reasonable manner *without the consent of the copyright owner*[.]" *Lewis Galoob Toys, v. Nintendo of America*, 964

F.2d 965, 969 (9th Cir. 1992) (citation omitted) (emphasis added).  In the preamble to Section 107, Congress identified several illustrative fair uses, including "*criticism*, *comment*, news reporting, teaching[,] … scholarship, or research."  (Emphasis added.)  As the Supreme Court has explained, Section 107 balances "the interests of authors … in the control and exploitation of their [works] … on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand[.]"  *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

To facilitate this balancing process, Congress set forth four, non-exclusive factors that a court shall consider in determining whether a particular use of a copyrighted work is a fair use:

> (1)      the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)      the nature of the copyrighted work;
>
> (3)      the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)      the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107(1)-(4).  These four factors must be considered together, and none may be "treated in isolation."  *Campbell*, 510 U.S. at 578.  Because no single fair-use factor is dispositive, "the moving party is not required to prevail on every factor" to establish fair use, *Norse v. Henry Holt and Co.*, 847 F. Supp. 142, 145 (N.D. Cal. 1994), and "need not 'shut out' her opponent on the four factor tally to prevail."  *Wright v. Warner Books*, 953 F. 2d 731, 740 (2d Cir. 1991).

Here, the balance of the factors weighs heavily in favor of a finding that *South Park*'s parody of the WWITB video constitutes a fair use.

11

**A. The Purpose And Character Of The South Park Defendants' Use**

The purpose of *South Park*'s use of elements of "What What (In The Butt)" is clear: to poke fun at WWITB, a prominent example of an inane viral video, as part of an extended commentary on the phenomenon of viral videos and Internet celebrity. *See* Ex. 2. Consequently, the first fair-use factor, which evaluates the "purpose and character" of the South Park Defendants' use, overwhelmingly weighs in favor of a finding of fair use. And this is so even though *South Park*, like most television programs, is a for-profit enterprise.

In *Campbell*, the Supreme Court emphasized that the "purpose and character" analysis under Section 107(1) is to be "guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or news reporting, and the like[,]" rather than by the defendant's status as a commercial or non-profit entity. 510 U.S. at 578-579. If mere "commerciality carried presumptive force against a finding of fairness," the Court explained, such a "presumption would swallow nearly all of the illustrative [fair] uses listed in the preamble paragraph to § 107, since these activities are generally conducted for profit in this country." *Id.* at 584.[9]

According to the Supreme Court, the "central purpose" of the first-factor analysis is to determine "whether the new work merely supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character." *Campbell*, 510 U.S. at 579 (brackets in original; citation omitted). A court must determine, "in other words, whether

---

[9] *See also Arica Institute Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (holding that favored statutory uses, such as parody, receive fair-use protection regardless of any "concurrent commercial purpose"); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986) ("[w]e do not read Section 107(1) as requiring us to make a clear-cut choice between two polar characterizations, 'commercial' and 'non-profit'"; "[w]ere that the case, fair use would be virtually obliterated, for '[a]ll publications presumably are operated for profit'") (citations omitted).

and to what extent the new work is '*transformative*,'" the "more transformative" a defendant's use, the more likely the court is to find fair use. *Id.* (emphasis added). Parody "has an obvious claim to transformative value" and "may claim fair use under § 107." *Id.* (use is transformative when it "adds something new, with a further purpose or different character, altering the [copyrighted material] with new expression, meaning or message").[10] To qualify as parody, the second work must "comment upon or criticize the original copyrighted work." *World Wrestling Federation Entertainment v. Big Dog Holdings*, 280 F. Supp. 2d 413, 426 (W.D. Pa. 2003). Parody generally takes the form of a work in which "the characteristic turns of thought and phrase in an author or class of authors are imitated in such a way as to make them appear ridiculous." *Campbell*, 510 U.S. at 580 (citations omitted).

*Campbell* is instructive. There, the rap group 2 Live Crew incorporated elements of Roy Orbison's classic song "Pretty Woman" – including the first line verbatim – into a vulgar and highly sexual song with the same title. 510 U.S. at 573, 582. The Supreme Court found that the stark contrast between the 2 Live Crew song and the genteel original "can be taken as a comment on the naiveté of the original of an earlier day, as a rejection of its sentiment that ignores the ugliness of street life and the debasement that it signifies." *Id.* at 584. For that reason, the Court suggested that the first fair-use factor weighed in 2 Live Crew's favor. *Id.*

In cases since *Campbell*, courts consistently have held that the first fair-use factor strongly favors parodists. In *Walking Mountain*, for example, Mattel brought copyright and trademark-infringement claims against an artist who created and sold photographs depicting Mattel's iconic Barbie doll in incongruous, sexually-charged situations, with the goal of

---

[10] *See also Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 518 (7th Cir. 2002) (identifying "parody" as protected fair use); Notes on Committee on the Judiciary, H.R. Rep. No. 1476, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News 5659, 5678-5679 (identifying "use in a parody" as an activity that qualifies as fair use under Copyright Act).

"critiqu[ing] the objectification of women" and "lambast[ing] the conventional beauty myth and the societal acceptance of women as objects." 353 F.3d at 792, 795. Affirming that the first factor favored fair use, the court observed that Mattel had created associations of "beauty, wealth, and glamour" with Barbie's image, and that the artist's work "turns this image on its head" by portraying Barbie in bizarre and fraught scenarios. *Id.* at 802. By putting Barbie in this new context, the court held that the artist "transformed Barbie's meaning" by "creat[ing] the sort of social criticism and parodic speech protected by the First Amendment and promoted by the Copyright Act." *Id.* at 802-803.

A pair of fair-use decisions involving the animated television series *Family Guy* also are on point. In *Burnett*, comedienne Carol Burnett sued for copyright infringement and other claims based on *Family Guy*'s parody of her beloved, wholesome "Charwoman" character from her 1970s sketch-comedy program. 491 F. Supp. 2d at 966-968. In the *Family Guy* episode in question, the lead character goes to a porn shop, and mentions that the store is cleaner than he had expected. *Id.* at 966. A friend explains that "Carol Burnett works part time as a janitor," as the screen cuts to an animated version of the Charwoman mopping the floor near some pornographic merchandise, as music that evokes *The Carol Burnett Show*'s theme song plays in the background. *Id.* The *Family Guy* characters then go on to joke about Ms. Burnett, including her familiar habit of tugging her ear at the end of her show. *Id.* In granting the defendants' motion to dismiss on fair-use grounds, the court declared that because "*Family Guy* put a cartoon version of Carol Burnett/the Charwoman in an awkward, ridiculous, crude, and absurd situation in order to lampoon" her, the program was a parody, and the first factor weighed decidedly in favor of fair use. *Id.*

Two years later, another district court found that the *Family Guy*'s use of elements from the Disney song "When You Wish Upon A Star" in a parody song entitled "I Need A Jew" was protected as a fair use. *Bourne*, 602 F. Supp. 2d at 506-509. The court explained:

> Defendants' use of 'When You Wish Upon a Star' calls to mind a warm and fuzzy view of the world that is ultimately nonsense; wishing upon a star does not, in fact makes one's dreams come true. By pairing Peter's 'positive,' though racist, stereotypes of Jewish people with that fairy tale world-view, 'I Need a Jew' comments both on the original work's fantasy of stardust and magic, as well as Peter's fantasy of the 'superiority' of Jews. The song can be 'reasonably perceived' to be commenting that any categorical view of a race of people is childish and simplistic, just like wishing upon a star.

*Id.* at 506-507, 509. In words that apply with particular force here, the court observed that "the owner of the rights to a well-known work must expect, or at least tolerate, a parodist's deflating ridicule." *Id.* at 511 (citations and internal quotes omitted).

The court made the same point in *Leibovitz*, where the celebrated photographer sued Paramount Pictures for copyright infringement after it released an ad for its movie *The Naked Gun 33 1/3* that featured actor Leslie Nielsen superimposed on the famous *Vanity Fair* cover photograph of a pregnant Demi Moore. 948 F. Supp. at 1222. The court explained that "[l]ike all parodies, [the ad] relies for its comic effect on the contrast between the original – a serious portrayal of a beautiful woman taking great pride in the majesty of her pregnant body – and the new work – a ridiculous image of a smirking, foolish-looking pregnant man. It thus fits squarely within the definition of parody[.]" *Id.* The Second Circuit affirmed, finding the ad to be a transformative parody because it "comment[ed], through ridicule, on what a viewer might reasonably think is the undue self-importance conveyed by the subject of the Leibovitz photograph." *Leibovitz*, 137 F.3d at 114-115. The Second Circuit held that the "joinder of reference and ridicule" in the ad – the "smirking face of Nielsen [that] contrasts so strikingly

15

with the serious expression on the face of Moore" – served as "a sufficient 'comment' to tip the first factor in [the] parodist's favor." *Id.*[11]

So, too, does Butters Stotch's naïve innocence contrast strikingly with the sexually provocative elements in the WWITB music video. *Compare* Ex. 1 *with* Ex. 2. This incongruity – what the *Walking Mountain* court called "turning the [plaintiff's] image on its head" (353 F.3d at 802) and the *Leibowitz* court called "a joinder of reference and ridicule" (137 F.3d at 114-115) – underscores the parodic nature of *South Park*'s use. Moreover, by putting Butters in the same room as the Numa Numa Guy, the Sneezing Panda, and their YouTube peers, the program's creators pointedly comment on the puzzling popularity of so many viral videos – including WWITB – despite their apparent lack of conventionally-accepted artistic merit. Ex. 2. Driving home the point that these inexplicably popular viral videos generate almost no economic revenue, the parody enables *South Park* to ridicule the striking writers' demands for a greater share of revenues that they presume Hollywood studios are generating from Internet distribution. *Id.* Because the creators of *South Park* unmistakably transformed the meaning of WWITB, the first factor weighs heavily in favor of fair use.

---

[11] *See also Elsmere Music v. Nat'l Broadcasting Co.*, 482 F. Supp. 741, 743-744 (S.D.N.Y. 1980), *aff'd* 623 F.2d 252 (2d Cir. 1980) (finding that first factor favored fair use where *Saturday Night Live* used elements of "I Love New York" ad jingle in "I-I-I-I Love Sodo-o-o-m" parody in which promoters of biblical city of Sodom sought to counter poor public image; *SNL*'s "song was as much a parody of the song, 'I Love New York,' a catchy, upbeat tune intended to alter a potential tourist's perceptions of New York, as it was of the overall 'I Love New York' advertising campaign"); *Lucasfilm v. MediaMarket Group*, 182 F. Supp. 2d 897, 901 (N.D. Cal. 2002) (denying motion for preliminary injunction by producers of *Star Wars* films against the producers of pornographic spoof; even though defendant's film was vulgar, it was protected as a "parody of Star Wars, in that it is a literary or artistic work that broadly mimics an author's characteristic style and holds it up to ridicule").

## B.  The Nature Of WWITB

The second factor in the fair-use inquiry is the "nature of the copyrighted work."  17 U.S.C. § 107(2).  "This factor calls for recognition that some works are closer to the core of intended copyright protection than others[.]"  *Campbell*, 510 U.S. at 586.  There are two elements to this factor – whether a work is creative or factual, and whether the work is published or not.  *Id.*  But as the Supreme Court pointed out in *Campbell*, the second factor cannot be given much weight in considering whether a parody is a fair use, "since parodies almost invariably copy publicly known, expressive works."  *Id.*

Even in non-parody cases, however, courts repeatedly have held that the second factor "strongly" weighs in favor of fair use when the copyrighted work already has been published. *See, e.g., Los Angeles News Service v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) ("the fact that the tape was published" before defendant's use "strongly" supports finding of fair use); *Lewis Galoob Toys v. Nintendo of America*, 780 F. Supp. 1283, 1293 (N.D. Cal. 1991) ("the works' published nature supports the fairness of the use"), *aff'd*, 964 F.2d 965 (9th Cir. 1992); *Arica Institute*, 970 F.2d at 1078 (stating that "[w]hether or not a work is published is critical to its nature under factor two").  Because WWITB has been viewed more than 37 million times (Ex. 3), and because *South Park* obviously parodies that underlying work, the second factor also favors a finding of fair use.

## C.  The Substantiality Of *South Park*'s Use

For the third factor – the amount and substantiality of the portion used in relation to the copyrighted work as a whole – the inquiry is "a flexible one."  *Nuñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000).  Because this factor "harken[s] back to the first of the statutory factors, … the extent of permissible copying varies with the purpose and character of

the use." *Campbell*, 510 U.S. at 586-587. *See also Karll v. Curtis Publ'g Co.*, 39 F. Supp. 836, 837-838 (E.D. Wis. 1941) (where a defendant's work "differs greatly in nature, scope, and purpose from the original, a larger liberty in making quotations and extracts will be permitted").

In parody cases, courts "have consistently held that a parody entitles its creator under the fair use doctrine to more extensive use of the copied work than is ordinarily allowed[.]" *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992). The reason for this is clear: "[p]arody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. Its art lies in the tension between a known original and its parodic twin." *Campbell*, 510 U.S. at 588. Thus, the Seventh Circuit has recognized that "a parodist has to be able to quote, *sometimes very extensively*, from the parodied work in order to make the criticism of it that is implicit in parodying it comprehensible." *Chicago Bd. of Education v. Substance, Inc.*, 354 F.3d 624, 629 (7th Cir. 2003) (emphasis added). In assessing the substantiality of the parodist's use of the underlying work, "*room must be allowed for judgment, and judges must not police criticism with a heavy hand.*" *Id.* (emphasis added). Even if a parodist uses a substantial amount of the plaintiff's work, the third factor will have "little, if any, weight against fair use so long as the first and fourth factors favor the parodist" – as they do here. *Leibovitz*, 137 F.3d at 116.

Consequently, the third factor generally is either neutral or favors fair use in parody cases. In *Elsmere Music*, for example, the court acknowledged that *Saturday Night Live* used the "heart" of the "I Love New York" jingle in its parody sketch, but nonetheless found that this factor favored fair use. 482 F. Supp. at 744. The court reiterated that "[a]n author is entitled to more extensive use of another's copyrighted work in creating a parody than in creating other

fictional or dramatic works." *Id.* Similarly, in *Eveready*, the court rejected strict limits on the amount of the plaintiff's work that a parodist may use:

> A parody is entitled at least to 'conjure up' the original. Even more extensive use would still be fair use, provided that parody builds upon the original, using the original as a known element of modern culture and contributing something new for humorous effect or commentary. Thus, this court holds that while the copyright law imposes limitations on the extent to which a parody may borrow from an original, the 'conjure up' test does not articulate this upper limit.

765 F. Supp. at 447-448. The court went on to find that a Coors ad featuring Leslie Nielsen, this time spoofing the Energizer Bunny, "did not borrow an impermissible amount." *Id.* (stating that although Nielsen dons "rabbit ears, tail, and feet (thus imitating certain bunny-like features)," he "is not a toy (mechanical or otherwise), does not run on batteries, is not fifteen inches tall, is not predominantly pink, [and] does not wear sunglasses or beach thongs").

The same is true here. *South Park's* parody appears full-screen for approximately 58 seconds, which is less than thirty percent of the length of the WWITB video. It uses some visual elements from the original to identify the work that is being parodied – most notably, the red, white and blue-striped background, the singer's black jeans and red shirt, and the chocolate heart – while omitting others, such as the burning cross and the screen full of rose petals, which itself presumably was intended to conjure up the famous scene from the 1999 film *American Beauty*. *Compare* Ex. 1 *with* Ex. 2. Just as the Court in *Leibovitz* noted that "without reference to the [Demi] Moore photograph, the Nielsen ad [depicting a pregnant Nielsen] simply is not very funny" (948 F. Supp. at 1222), *South Park*'s parody would be significantly diluted if it could not include these visual elements from WWITB. The parody also includes other visual elements that do not appear in WWITB, including fireworks and numerous cutaway shots to other characters watching the boys' video on their computer monitors. Ex. 2. During those cutaways, which

19

account for nearly one-third of the parody's total time, it appears on characters' computer monitors, occupying only a small portion of the television screen. Because *South Park* used elements of WWITB for parody purposes and did not use an impermissible amount of the original video, the third factor also favors fair use.

### D. The Effect On The Market For WWITB

Generally, the fourth factor – the "effect of the use upon the potential market for or value of the copyrighted work" – weighs in favor of a parodist. While the fourth factor ordinarily turns on whether the defendant has supplanted the market for the original, that calculation rarely is relevant to parodies. As the Supreme Court has noted, "*there is no protectable derivative market for criticism*. … [T]he unlikelihood that creators of imaginative works will license … lampoons of their own productions removes such uses from the very notion of a potential licensing market." *Campbell*, 510 U.S. at 592 (emphasis added). This rule is vital to free expression; if only licensed parodies were permitted, a copyright owner effectively could prevent parodies of his work. *See, e.g., Walking Mountain*, 353 F.3d at 806. Ultimately, "the economic effect of a parody with which [a court is] concerned is not its potential to destroy or diminish the market for the original – any bad review can have that effect – but rather whether it *fulfills the demand* for the original." *Fisher v. Dees*, 794 F.2d 432, 437-438 (9th Cir. 1986) (emphasis in original). *See also Maxtone-Graham*, 803 F.2d at 1264 (fact that copyrighted work and allegedly infringing work served "fundamentally different functions" weighed in favor of fair use finding on fourth factor).

Applying this test, courts repeatedly have held that parodies do not fulfill the demand for the works that they target, and that the fourth factor thus favors fair use. In *Fisher*, for example, the court as a matter of law stated that the demand for the song "When Sunny Gets Blue," a

nostalgic reminiscence about lost love, was not supplanted by the defendant's parody "When Sonny Sniffs Glue," a song describing the physical aftermath of glue-sniffing. 794 F.2d at 438. Similarly, in *Elsmere Music*, the court held that the song "I Love Sodom" did not satisfy the demand for the song "I Love New York." 483 F. Supp. at 747. And in *Walking Mountain*, the court rejected the argument that the defendant's photographs of Barbie dolls in bizarre, sexual situations had any market effect on Mattel's sale or licensing activities. 353 F.3d at 804-806.

Here, *South Park*'s parody does not remotely fulfill the same demand as WWITB. The original viral video promotes a sexually suggestive song, designed to titillate as much as entertain. In contrast, *South Park*'s parody replaces knowing sexuality with childish innocence, even as it comments on the inanity of the original video and of many of the viral videos that apparently fascinate the public. *Compare* Ex. 1 *with* Ex. 2. Because the two works serve "fundamentally different functions," the fourth factor weighs strongly in favor of fair use.

Taken together, the balance of the fair-use factors – and particularly the crucial first and fourth factors – tilts heavily toward a finding of fair use. The Court, therefore, should dismiss Brownmark's claims.

## 6. CONCLUSION

Brownmark may be unhappy that *South Park* parodied WWITB. But copyright law does not allow the owners of works like WWITB (much less nonexclusive licensees like Brownmark) to punish or to silence critics. *South Park*'s parody reflects the extraordinary publicity that WWITB has attracted; critical commentary is one of the costs of such success. Because Brownmark lacks standing to prosecute this action and because the fair-use doctrine

protects *South Park*'s parody of WWITB, the South Park Defendants respectfully request that this Court grant their motion and dismiss Brownmark's amended complaint with prejudice.


DATED:  February 22, 2011

GODFREY & KAHN
JAMES D. PETERSON
Wisconsin State Bar No. 1022819

DAVIS WRIGHT TREMAINE LLP
ALONZO WICKERS IV (*OF COUNSEL*)
CALIFORNIA STATE BAR NO. 169454
JEFF GLASSER (*OF COUNSEL*)
CALIFORNIA STATE BAR NO. 252596

BY:   *s/ James D. Peterson*
          JAMES D. PETERSON

ATTORNEYS FOR DEFENDANTS
COMEDY PARTNERS, MTV NETWORKS,
PARAMOUNT HOME ENTERTAINMENT,
SOUTH PARK DIGITAL STUDIOS LLC, AND
VIACOM INTERNATIONAL, INC.


GODFREY & KAHN
One East Main St., Suite 500
P.O. Box 2719
Madison, Wisconsin  53701-2719
(608) 257-3911
Fax:  (608) 257-0609

DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa St., Suite 2400
Los Angeles, California 90017-2566
(213) 633-6800
Fax:  (213) 633-6899


6027911_1