# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

BROWNMARK FILMS, LLC,

          Plaintiff,

    v.                                    Case No. 10-CV-1013

COMEDY PARTNERS, MTV NETWORKS,
PARAMOUNT HOME ENTERTAINMENT, INC,
SOUTH PARK DIGITAL STUDIOS LLC, and
VIACOM INTERNATIONAL, INC.,

          Defendants.

_____

# ORDER

Federal lawsuits seldom touch on such riveting subjects and regard so many colorful parties as the present matter. The plaintiff, Brownmark Films, LLC ("Brownmark"), is the purported co-owner of a copyright in a music video entitled "What What (In the Butt)" ("WWITB"), a nearly four minute ditty regarding the derrière of the singer of the underlying work. (Am. Compl. ¶¶ 11-13). The music video begins with an array of bizarre imagery – from a burning cross to a floating pink zeppelin – and only gets stranger from there. The heart of the video features an adult African American male ensconced in a bright red, half-buttoned, silk shirt, dancing, grinning creepily at the camera, and repeatedly singing the same cryptic phrases: "I said, what what, in the butt" and "you want to do it in my butt, in my butt." Meanwhile, the defendants are the entities involved in the production of "South Park," an animated sitcom that centers on the happenings of four foul-mouthed fourth graders in a small mountain town in Colorado. _Id._ ¶¶ 6-10. In the nearly

fifteen years South Park has aired on Comedy Central, the four central characters have, amongst other adventures, battled space aliens,[1] hunted Osama Bin Ladin in the wake of 9/11 ala Elmer Fudd and Bugs Bunny,[2] and have, more recently, resolved the nation's economic woes by charging the nation's consumer debts on one of the character's credit card.[3]

Brownmark and the makers of South Park find themselves litigating against each other in federal court as a result of an April 2, 2008 episode of the television program. (Am. Compl. ¶ 14). Specifically, Brownmark's amended complaint seeks damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*, against the defendants because of a South Park episode entitled "Canada on Strike." (Docket #6). In that episode, one of the characters – the naive "Butters Stotch" – is coaxed by his fellow classmates to record an internet video in the hopes of "making money on the Internet." The video – which lasts for fifty eight seconds of the approximately twenty-five minute episode – replicates parts of the WWITB video, with the nine-year old Butters singing the central lines of the original video, while dressed as a teddy bear, an astronaut, and even as a daisy. In the episode, Butters' video, much like the original WWITB video, goes "viral," with millions watching the clip. However, after their attempts to collect "internet money"

---

[1] *See South Park: Cartman Gets an Anal Probe* (Comedy Central television broadcast Aug. 13, 1997).

[2] *See South Park: Osama bin Laden Has Farty Pants* (Comedy Central television broadcast Nov. 7, 2001).

[3] *See South Park: Margaritaville* (Comedy Central television broadcast March 25, 2009).

prove fruitless, the South Park fourth graders learn that their video, much like other inane viral YouTube clips, have very little value to those who create the work.

For as remarkable and fascinating the parties and issues surrounding this litigation are, this order, which will resolve a pending motion to dismiss (Docket #8), will be, by comparison, frankly quite dry. The central legal issues surrounding the motion to dismiss require that the court resolve several relatively tricky issues regarding copyright law and civil procedure, hardly the sort of subject that would create millions of fans, as the work of all of the parties before the court did. Nonetheless, while the court has a "tough job," "someone has to do it," and, "with shoulder to the wheel," this court "forge[s] on" to resolve the pending motion. *Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 358 (7th Cir. 2009).

Before resolving the substance of the defendant's motion to dismiss, however, the court must discuss the procedural rules animating a Fed. R. Civ. P. 12(b)(6) motion. Fed. R. Civ. P. 12(b)(6) permits a defendant to assert a defense that the underlying complaint fails to state a claim upon which relief can be granted. To survive a 12(b)(6) motion to dismiss, the plaintiff's complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

-3-

liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949; *see also Swanson v. Citibank, N.A.,* 614 F.3d 400, 404-05 (7th Cir. 2010) ("[T]he plaintiff must give enough details about the subject-matter of the case to present a story that holds together . . . the court will ask itself *could* these things have happened, not *did* they happen."). More broadly, a district court must consider whether the plaintiff's allegations are "unrealistic or nonsensical," purely "speculative," or even "contradict other" allegations in deciding the ultimate question of whether a complaint has "enough substance to warrant putting the defendant through the expense of discovery." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). With these principles in mind, the court proceeds to examine the defendants' arguments in order.

## A. Standing

First, the defendants argue that Brownmark does not have standing to sue for copyright infringement. (Def.'s' Br. at 1). The amended complaint indicates that Robert T. Ciraldo ("Ciraldo"), Andrew T. Swant ("Swant"), and Sam Norman ("Norman") "created [the] original music video known as" WWITB. (Am. Compl. ¶ 11). Eventually, the three individuals registered the copyright in the video with the United States Copyright Office and secured a Certificate of Registration for the copyright. *Id.* ¶ 12. The amended complaint further states that Messrs. Ciraldo and Swant – but not Mr. Norman – "assigned their interest" in WWITB to Brownmark in 2008. *Id.* ¶ 13. Relying on the Ninth Circuit case of *Sybersound Records, Inc. v.*

*UAV Corp.,* 517 F.3d 1137, the defendants contend that "unless all the other co-owners of the copyright joined in granting an exclusive right to" a party, all Brownmark obtained from Mr. Ciraldo and Mr. Swant was a non-exclusive license in WWITB, which is insufficient to obtain standing to sue for a copyright violation. (Def.'s' Br. at 9-10) (citing *Sybersound Records*, 517 F.3d at 1145-46). The court, however, is unpersuaded by the defendants' first argument.

The determination of whether a party has standing to sue for copyright infringement is governed by section 501(b) of the Copyright Act. Section 501(b) provides, in relevant part, that "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."[4] 17 U.S.C. § 501(b). Put another way, those who have exclusive rights in a copyright have standing to sue for copyright infringement, whereas "a person holding a non-exclusive license is not entitled to complain about any alleged infringement of the copyright." *Hyperquest, Inc.* 632 F.3d at 382. As such, the issue for the court is whether Brownmark is the owner of an *exclusive* right provided by the copyright for WWITB. To resolve this issue, the court must take a step back and examine the rights afforded to joint authors of a copyrighted work.

---

[4] In turn, the Copyright Act entitles a copyright owner to a bundle of six different exclusive rights, including the right to reproduce the copyrighted work and the right to prepare derivative works based on the copyrighted work. *Hyperquest, Inc. v. N'Site Solutions, Inc.*, 632 F.3d 377 (7th Cir. 2011) (quoting 17 U.S.C. § 106).

Case 2:10-cv-01013-JPS   Filed 07/06/11   Page 5 of 20   Document 23

Under 17 U.S.C. § 201(a), the authors of a joint work are necessarily "co-owners of copyright in the work." The Seventh Circuit has interpreted this language in the Copyright Act to afford "significant" benefits to a joint owner of a copyrighted work, in that each owner holds an "undivided interest in the work," allowing each owner to independently use and license the joint work, subject only to a duty to account to a co-author for any profits. *See Janky,* 576 F.3d at 361 (quoting *Erickson v. Trinity Theatre*, 13 F.3d 1061, 1068 (7th Cir. 1994)); *see also Seshadri v. Kasraian*, 130 F.3d 798, 801 (7th Cir. 1997). Indeed, "joint authors co-owning [a] copyright in a work 'are deemed to be tenants in common.'" *Community for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1498 (D.C. Cir. 1988) (internal citations omitted) (Ginsburg, J.); *see also* 1-6 NIMMER ON COPYRIGHT § 6.09 ("[T]he relationship between such joint owners is said to be that of a tenancy-in-common"); GOLDSTEIN ON COPYRIGHT § 4.2.2 ("As co-owners under section 201(a) of the Copyright Act, coauthors are tenants in common of their copyright in the joint work.") Inherent in a tenancy in common is a breadth of rights for each co-tenant, including the right to "unilaterally alienate their shares through sale or gift," *United States v. Craft*, 535 U.S. 274, 280 (2002) (describing generally the English common law concept of the tenancy in common), to another who will step into the shoes of the original co-tenant. *See* WILLIAM B. STOEBUCK AND DALE A. WHITMAN, THE LAW OF PROPERTY§ 5.2 (3d ed. 2000) ("Since the interest of a tenant in common is alienable . . . a tenant in common may, without the consent of his cotenants transfer his

-6-

interest .")  Moreover, tenants in common "have many other rights in the property, including the right to use the property, to exclude from third parties from it, and to receive a portion of any income produced from it." *Craft*, 535 U.S. at 280.  Given this concept of the rights of a co-owner of a copyright, it is of little wonder that the Seventh Circuit concluded that being a co-owner of a copyright has "significant" benefits.  *Janky,* 576 F.3d at 361; *see generally* GOLDSTEIN ON COPYRIGHT § 4.2.2 ("Courts deciding disputes between copyright co-owners have generally looked for analogies to the law governing real property tenancies in common.")

However, the Ninth Circuit in *Sybersound Records* did not view the rights of a co-owner of a copyright in such a broad manner.   Specifically, the *Sybersound Records* court held that the only means by which a third party can obtain an exclusive license in a copyright of a jointly-authored work is to have "all" of the co-owners grant such a license.   517 F.3d at 1146.  Moreover, according to the Ninth Circuit, a co-owner of a copyright cannot unilaterally alienate their share of the intellectual property and instead can "only grant a nonexclusive license" to a third party.  *Id.* The *Sybersound Records* court provides two rationales for the rather bold limit on a co-owner of a copyright's ability to transfer their property interest.   First, the Ninth Circuit contends that if a co-owner were able to independently grant exclusive rights in a copyright, such an act would risk "limit[ing] the other co-owners' independent rights to exploit the copyright." *Id.* However, this rationale makes little sense.  Granting even a non-exclusive license – an act which no one contends a co-

-7-

owner of copyright cannot unilaterally undertake – has the potential to limit the utility

of the underlying copyright.    At the most extreme, a co-owner of a copyright could

grant non-exclusive licenses to the entire world to reproduce or prepare derivatives

of the underlying work, rendering the underlying copyright useless.    The other co-

owners would have the right to an accounting from the co-owner who granted the

slew of non-exclusive licenses, *Seshadri*, 130 F.3d at 801, but no one can credibly

argue that the risk of limiting the other co-owner's rights can be used to artificially

restrict the alienability of the co-owner's right to transfer their interest in the

copyright.    To accept the Ninth Circuit's argument would undermine a basic tenet

underlying the Copyright Act that the ownership of a copyright is freely transferable,

17 U.S.C. § 201(d)(1), and would stand in sharp contrast to the nature of the rights

of a co-owner of a copyright as endorsed by the Seventh Circuit.  *Janky,* 576 F.3d

at 361.

Second, the Ninth Circuit premised its decision in *Sybersound Records* on a

rather narrow definition of exclusivity in the context of a jointly-owned copyright.

Specifically, the Ninth Circuit reasoned that, because the other co-owners could use

the copyright in question even after the assignment of the right by one co-owner to

a third party, the assignment was by definition non-exclusive.  517 F.3d at 1146

("Since TVT's assignment was admittedly non-exclusive, TVT succeeded only in

transferring what it could under 17 U.S.C. § 201(d), a non-exclusive license.")   The

*Sybersound Court,* however, presumed, without any basis in the law, that a co-owner

-8-

of a copyright has only non-exclusive rights, preventing a co-owner from granting exclusive rights to a third party. Perhaps calling a unilateral grant by one co-owner to a third party "exclusive" involves a play on words that does not comport with our typical view of word "exclusive" in other contexts, *see, e.g., I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996) ("In an exclusive license, the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others"), but worshiping at the altar of linguistic consistency would render a co-owner, whose interests in the copyright inherently are not limited to him or herself, all but powerless to prevent infringement of that copyright. More broadly, adopting the Ninth Circuit's reasoning would mean that a co-owner of a copyright can never effectively transfer a partial interest in a copyright. It is for these reasons that the *Sybersound Records* court's holding has been widely lampooned in several respected treatises. *See* 1-6 NIMMER ON COPYRIGHT § 6.10[A][2][d] ("[A] grant . . . that characterizes itself as exclusive, should be treated as such . . . [t]he contrary conclusion in *Sybersound* threatens to vitiate enforcement in general of joint works"); WILLIAM F. PATRY, PATRY ON COPYRIGHT § 5:103 ("The *Sybersound* court . . . [has] made co-owners agunot, to each other until a Get, is obtained or a Bet Din, steps in and settles the matter . . . [t]his isn't what Congress intended.")

In sum, while the *Sybersound Records* decision is most definitely authoritative, it is far from persuasive. Instead, this court agrees that "[t]he determination of

whether a grant is exclusive or non-exclusive depends on the grant."1-6 NIMMER ON

COPYRIGHT § 6.10[A][2][d]; *see also* PATRY ON COPYRIGHT § 5:103 ("[Congress]

intended that co-owners be able to grant nonexclusive licenses without the others'

permission and that they be able to transfer their proportional share in the whole

without the others' permission, in which case the transferee would indeed stand in

the shoes of the transferor.")  Here, accepting the allegations in the complaint as

true, Messrs. Ciraldo and Swaint's grant of their interest in WWITB was a complete

assignment of rights to Brownmark (Am. Compl. ¶ 13), and, accordingly, Brownmark

has standing to sue for infringement of the underlying copyright. *Hyperquest, Inc.*

632 F.3d at 382.  The court proceeds to examine the defendants' second argument

for dismissing the amended complaint.

**B.    Fair Use**

In the alternative, the defendants argue that Brownmark's copyright

infringement claims are barred by the fair-use doctrine as codified at 17 U.S.C.

§ 107.  (Def.'s' Br. at 2).    In support of their fair-use defense argument, the

defendants have submitted video of the original WWITB video and the South Park

episode "Canada on Strike."    (Docket #10).  Ordinarily, courts may not rely upon

materials outside of the pleadings when considering a motion to dismiss under

Fed. R. Civ. P. 12(b)(6) without converting the motion to one for summary judgment.

Fed. R. Civ. P. 12(d).  There is an exception to this general rule, however, where the

material in question is expressly referenced in the complaint and is central to the

Case 2:10-cv-01013-JPS   Filed 07/06/11   Page 10 of 20   Document 23

plaintiff's claim. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *see generally Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that a court may rely on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" in deciding whether a complaint fails to state a claim upon which relief may be granted). Here, there is no doubt that the two videos in question are central to the plaintiff's claim, and indeed no party argues that the court cannot rely on the videos in evaluating whether Brownmark has failed to properly state a claim for copyright infringement. However, the rub is that "fair use" is viewed as an affirmative defense, as opposed to a central element of copyright infringement. *See Janky,* 576 F.3d at 361 (holding that the two elements of a copyright infringement claim are: (1) the plaintiff owns a valid copyright right; and (2) the defendant(s) copied "constituent elements of the work that are original"); *see also Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (holding that fair use is an affirmative defense). Hence, the central issue is whether this court can resolve a motion to dismiss in the defendants' favor because of the existence of the affirmative defense of fair use.

A complaint is "subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock*, 549 U.S. 199, 215 (2007). Construed with the incorporation by reference doctrine discussed in *Tierney,* an affirmative defense can be the basis for a dismissal under Fed. R. Civ P. 12(b)(6) when the allegations of the complaint and material that expressly

-11-

referenced the complaint and is central to the plaintiff's claim "set forth *everything* necessary to satisfy the affirmative defense." *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)) (emphasis added). In other words, plaintiffs have to plead themselves out of court by admitting all the ingredients of an "impenetrable defense." *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008). A Fed. R. Civ. P. 12(b)(6) motion cannot be granted based on an affirmative defense when the plaintiff's recovery is "still plausible" even under the facts taken from the face of the complaint and the documents it references that are central to the claim. *Id.*

Ultimately, "context is king" in this case in deciding whether the plaintiff has provided in its complaint and the materials referenced in that complaint the necessary information to warrant a dismissal based on an affirmative defense. Here, the amended complaint discusses a very *limited context* for the alleged infringement. Specifically, the amended complaint notes that the use of WWITB by the makers of South Park was in the context of the specific episode entitled "Canada on Strike," in which one of the characters sings the musical composition in question and recreates the imagery associated with the music video. (Am. Compl. ¶¶ 14-15). Notably, the infringing actions are limited in the complaint to the distribution of the *episode* on television, *id.* ¶ 16, on South Park's website, *id.* ¶ 17, on iTunes and Amazon.com, *id.* ¶ 18, and on DVD and Blu-Ray discs of "South Park Season 12 (Uncensored)."

-12-

Case 2:10-cv-01013-JPS   Filed 07/06/11   Page 12 of 20   Document 23

*Id.* ¶ 19. In other words, the complaint does not allege that the defendants are somehow using the WWITB video in any other form other than in the production and distribution of the episode "Canada On Strike." One could imagine, for example, the makers of South Park using the sound clips or images from the WWITB video to promote the show in an advertisement or on a poster. In other words, the defendants *could* be using the WWITB video in a way completely divorced from the episode in question. However, the amended complaint does not make such allegations and instead limits its discussion of how South Park is infringing the plaintiff's copyright to how the WWITB music video is used in the context of the episode "Canada on Strike." Accordingly, the court needs to decide whether the defendants use of the copyrighted material in the context of the episode "Canada on Strike" is fair use. If a viewing of the episode and the original work warrants a determination that the use of the WWITB video was "fair," as defined by 17 U.S.C. § 107, the allegations of the complaint and material that are expressly referenced in the complaint have "set forth *everything* necessary to satisfy the affirmative defense" and dismissal is warranted because the complaint is purely speculative. *Brooks,* 578 F.3d at 579. Conversely, if in viewing "Canada on Strike" and the WWITB video the court can reasonably infer that the defendants' use of WWITB was not a "fair use," the plaintiff's recovery is "still plausible" and this case should proceed. *Tamayo*, 526 F.3d at 1086.

-13-

While evaluating an affirmative defense, and indeed the "fair use" defense, at the pleadings stage is "irregular," *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 627 (7th Cir. 2003), given the scope and nature of the infringement alleged by the amended complaint, coupled with the rather obvious resolution of the substantive underlying issue, the court can conclude that this dispute simply does not warrant "putting the defendant[s] through the expense of discovery." *Atkins,* 631 F.3d at 832. Moreover, in contrast to the Seventh Circuit's decision in *Substance, Inc.,* here the plaintiff has not even bothered to address the substance of the fair use question, providing this court with absolutely no indication of any evidence or factors outside of the episode in question that could even possibly influence the resolution of the fair use issue in the plaintiff's favor. Brownmark has not provided a reason, nor can this court speculate as to why this matter cannot be resolved by looking to the pleadings and the materials incorporated by reference in the pleadings. Consequently, the court finds nothing wrong with addressing the substance of the fair use issue through the Fed. R. Civ. P. 12(b)(6) motion. *See generally Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (holding that a court may conduct a fair use analysis, as a matter of law, where the facts are presumed or admitted); *see also Fisher v. Dees*, 794 F.2d 432, 435-36 (9th 1986) (affirming a finding of fair use where the material facts were not at issue or were admitted). Indeed, in this circuit and others, evaluating fair use issues in the context of a Fed. R. Civ. P. 12(b)(6) motion is commonplace. *See Forest River, Inc. v.*

-14-

*Heartland Rec. Vehicles, LLC*, 753 F. Supp. 2d 753, 766 (N.D. Ind. 2010) (evaluating the fair use defense in connection with a motion to dismiss, but denying the motion on substantive grounds); *Karll v. Curtis Publ'g Co.,* 39 F. Supp. 836, 837-38 (E.D. Wis. 1941) (granting motion to dismiss infringement claim because of fair use defense); *Shell v. DeVries*, 07-1086, 2007 U.S. App. LEXIS 28317, at *4 (10th Cir. Colo. Dec. 6, 2007) (same); *Burnett v. Twentieth Century Fox,* 491 F. Supp 2d 962, 971-72 (C.D. Cal. 2007) (same); *Sedgwick Claims Mgmt. Svcs. v. Delsman,* No. 09-1468, 2009 U.S. Dist. LEXIS 61825, at *20 (N.D. Cal. July 16, 2009) (same); *see generally Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (holding that the application of the fair use doctrine at the pleading stage is appropriate).  The court proceeds to the substance of the fair use question.

The fair use doctrine allows for a "limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent." *Fisher,* 794 F.2d at 435.  The rationale behind the doctrine is that unauthorized uses of a copyright are permissible when they "advance the underlying constitutional purpose of copyright law: to promote broad public availability of literature, music, and other forms of creative arts." BRUCE P. KELLER AND JEFFREY P. CUNARD, COPYRIGHT LAW: A PRACTITIONER'S GUIDE § 8.3 (2010). Specifically, 17 U.S.C. § 107, which codifies common law fair use principles, provides that the "fair use of a copyrighted work" for such purposes as "criticism" and "comment" "is not an infringement of a copyright."  Moreover, the statute provides

-15-

four guideposts by which to determine whether a particular use is "fair": (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.* However, as the Seventh Circuit has cautioned, "the four factors that Congress listed when it wrote a fair use defense . . . into the Copyright Act . . . are not exhaustive and do not constitute an algorithm that enables decisions to be ground out mechanically." *Substance, Inc.*, 354 F.3d at 629; *Ty, Inc. v. Publ'Ns Int'l*, 292 F.3d 512, 522 (7th Cir. 2002) ("[T]he four factors are a checklist of things to be considered rather than a formula for decision."). Ultimately, the "fair use copier must copy no more than is reasonably necessary . . . to enable him to pursue an aim that the law recognizes as proper," such as "the aim of criticizing the copyrighted work effectively." *Substance, Inc.,* 354 F.3d at 629. Moreover, application of the fair use doctrine requires a case-by-case analysis. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577, 590, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994). With this framework for evaluating the fair use issue in mind, the court turns to the two works in question.

Here, applying the statutory factors from Section 107 of the Copyright Act and the principles behind the fair use doctrine, the court readily concludes that the defendants use of the music video in the South Park episode "Canada on Strike" was "fair." One only needs to take a fleeting glance at the South Park episode to

-16-

gather the "purpose and character" of the use of the WWITB video in the episode in question. The defendants used parts of the WWITB video to lampoon the recent craze in our society of watching video clips on the internet that are – to be kind – of rather low artistic sophistication and quality.[5] The South Park episode "transforms" the original piece by doing the seemingly impossible – making the WWITB video even more absurd by replacing the African American male singer with a naive and innocent nine-year old boy dressed in adorable outfits. The episode then showcases the inanity of the "viral video" craze, by having the South Park fourth graders' version of the WWITB video "go viral," seemingly the natural consequence of merely posting a video on the internet.  More broadly, the South Park episode, with its use of the WWITB video, becomes a means to comment on the ultimate value of viral YouTube clips, as the main characters discover that while society is willing to watch absurd video clips on the internet, our society simultaneous assigns little monetary value to such works.  The South Park "take" on the WWITB video is truly transformative, in that it takes the original work and uses parts of the video to not only poke fun at the original, but also to comment on a bizarre social trend, solidifying the work as a classic parody. *See Campbell*, 510 U.S. at 580 (noting that a "parody" comments "on the original or criticiz[es] it to some degree.")  Such use of a copyrighted work, which uses the work and transforms it for another purpose, lends this court to

---

[5] While the episode may be a vehicle in which to comment on other issues, such as the 2007-2008 writers strike, the court need not – and should not – go beyond the pleadings and the materials incorporated by reference into the amended complaint in evaluating the fair use issue.

Case 2:10-cv-01013-JPS   Filed 07/06/11   Page 17 of 20   Document 23

conclude that the defendants' use is fair. *Id.* at 579 (holding that "the more transformative the new work," the more likely the use of the old work is a fair one); *see generally* KELLER AND CUNARD, COPYRIGHT LAW: A PRACTITIONER'S GUIDE § 8.5.5 ("The special nature of parodies . . . make a finding of fair use more likely.").

Beyond the "purpose and nature of the work" statutory factor, the court also looks to the remaining issues raised in Section 107 of the Copyright Act. The "nature" of the copyrighted work factor is not particularly helpful to the court, however: while fair use is more difficult to establish when a core work is copied as opposed to when an infringer takes material that is only marginally within copyright protection, the "nature" of the copyright in question does not help this court assess whether South Park's parody is a fair use, because "parodies almost invariably copy publicly known, expressive works." *Campbell,* 510 U.S. at 586. Additionally, the court notes that the use of the copyrighted work in the South Park episode was relatively insubstantial. The defendants' work did not mirror the original WWITB video – indeed, the derivative work was a *cartoon* of a nine year old boy repeating just enough lines WWITB to conjure up the original work. Notably, the WWITB snippet in the South Park episode was less than a third of the length of the original work. The use of the imagery and words of the original work was all but the minimum needed by the defendants to accomplish their goal of commenting on a social phenomenon. *Substance*, 354 F.3d at 629. Finally, there is little risk that derivative work in question would somehow usurp the market demand for the

-18-

original: the South Park episode lampoons viral video crazes, while the WWITB

video is the epitome of a clip that fuels such crazes. *Campbell,* 510 U.S. at 524

("[T]here is no protectible derivative market for criticism.")  Looking at the Section

107 factors together, keeping in mind the purposes of the fair use doctrine, the court

can easily conclude that South Park's parody of the WWITB video falls squarely

within the fair use protections afforded by the Copyright Act.  If the use by the

defendants of the copyrighted work is somehow "unfair," it remains at the wholly

speculative level, leaving the court with no choice but to grant the defendants' motion

to dismiss.

Finally, the court concludes that the dismissal ought be with prejudice.  Twice

the plaintiff has filed a complaint in this court based on the use of the copyrighted

work in an episode of South Park.   (Docket #1, #6).  Moreover, under recent

changes to Fed. R. Civ. P. 15(a), the plaintiff had an additional opportunity to file a

pleading to cure the errors raised by the motion to dismiss – in this case, the plaintiff

could have filed a complaint that raised infringement claims outside of the context

of the use of the copyrighted work in the production and dissemination of the South

Park episode "Canada on Strike."   Despite these opportunities to resolve rather

glaring problems with the substance of the underlying dispute, the plaintiff has

looked elsewhere and instead filed briefs that wholly ignored the central issue of this

litigation, fair use.  Such behavior is indicative of the efficacy of this litigation, which

rightfully ends now.

Accordingly,

**IT IS ORDERED** that the defendants' motion to dismiss (Docket #8) be and

the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby

**DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 6th day of July, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-20-